GORDON & REES LLP
John L. Haller, California Bar No. 61392
101 West Broadway, Suite 1600
San Diego, CA  92101
619-696-6700
619-696-7124 FAX
jhaller@gordonrees.com

F.S. FARRELL, LLC
Frank S. Farrell, Minnesota Att. No. 28447
7101 York Avenue South, Suite 153
Edina, MN 55435
952-921-3260
952-216-0106 FAX
frank@fsfarrell.com

ZARLEY LAW FIRM, P.L.C.
Timothy J. Zarley, Iowa Bar No. 15785
Capital Square, Suite 200
400 Locust Street,
Des Moines, IA 50309-2350
515-558-0200
515-558-7790 FAX
tzarley@zarleylaw.com

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOON PARK, AN INDIVIDUAL, <br><br> PLAINTIFF, <br><br> VS. <br><br> CAS ENTERPRISES, INC. <br> AN IOWA CORPORATION <br> D/B/A KREG TOOL COMPANY <br><br> DEFENDANT. | CIVIL NO. 08-CV-0385 DMS NLS <br><br> **DEFENDANT CAS ENTERPRISES D/B/A KREG TOOL COMPANY'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** <br><br> Trial:   June 21, 2010 <br> Time:   9:00 A.M. <br> Place:   Courtroom 10 <br> Judge:   Hon. Dana M. Sabraw |

Defendant CAS Enterprises, Inc. d/b/a Kreg Tool Company (hereinafter "Kreg Tool") hereby submits this Memorandum of Contentions of Fact and Law pursuant to CivLR 16.1(f)(2) and (3) and pursuant to Fed. R. Civ. P. 26(a)(3), and the Scheduling Order in this case.

## DEFENDANT'S CONTENTIONS OF FACT

1. The Defendant, Kreg Tool, is a cooperation based in Huxley, Iowa, that was founded in 1986 by Craig Sommerfeld to manufacture woodworking equipment.

2. Building his product during the week and promoting the product at woodworking shows on the weekend, Kreg Tool found a market that had no knowledge of the wood joining method it was promoting.

3. Hundreds of trade shows and thousands of demonstrations later, Kreg Tool emerged as the leader in Pocket Hole Technology. From manual pocket hole jigs to fully-automatic Pro Series machines, Kreg Tool offers a simple solution that has changed the way thousands of woodworkers join wood.

4. On October 28, 2003, U.S. Patent No. 6,637,988 ('988 patent) titled "Adjustable Pocket Drilling Fixture" was issued by the United States Patent Office to Joon Park, the Plaintiff.

5. The '988 patent claimed as its purpose the advantages of placing the clamp actuator on the same side as the guide carrier of the pocket hole jig, and the quick and easy adjustment of the guide carrier either selectively to any position or to a discrete position.

6. At the time that the '988 patent was filed, there existed other pocket hole jigs that provided same side clamping and easy and quick adjustment of the guide carrier.

7. Park knew of other devices that provided these features during the pendency of the '988 patent, but did not disclose them to the Patent Office as is required.

8. In 2005, Kreg Tool introduced a new pocket hole jig known as the K3 jig. The K3 jig was an improvement of the Kreg Tool K2000, which provided easy and quick adjustment of the guide carrier, as well as an improvement of Kreg Tool's A2H and A2F, which provided same-side actuation.

9. Kreg Tool did not have knowledge of and did not copy the '988 patent when it designed and developed the K3 pocket hole jig.

10.     On November 14, 2006, U.S. Patent No. 7,134,814 (the '814 patent) titled "Adjustable Pocket Drilling Fixture" issued to Joon Park.

11.     The '814 patent is a continuation-in-part of the '988 patent and generally added indicia to the upright guide bars and a new embodiment as shown in Figures 9-12.

12.     Despite knowledge of other devices that included patented features, Park still did not fully disclose all of the devices to the Patent Office during the pendency of the '814 patent as is required.

13.     Kreg Tool did not learn of the '814 patent or the '988 patent until the Fall of 2006.

14.     In the Fall of 2006, Kreg Tool learned that Joon Park, the Plaintiff, believed that Kreg Tool's K3 jig infringed Park's patents.

15.     Upon learning of the '814 and the '988 patent, Kreg Tool formed a good faith belief that the K3 pocket hole jig did not infringe the claims of the '988 and the '814 patents.

16.     In 2008, Kreg Tool introduced a new pocket hole jig known as the K4 pocket hole jig. The K4 combined the clamping structure of the K2000 with the easy and quick adjustment of the guide carrier of the K3 pocket hole jig. The Court determined that the K4 jig does not infringe the '988 or the '814 patents.

17.     To promote the K4 pocket hole jig, Kreg Tool invested a substantial amount for an infomercial that has had a dramatic affect on sales.

18.     On February 29, 2008, Joon Park filed the present lawsuit claiming that Kreg Tool's K3 and K4 jigs infringe the '988 and the '814 patents.

19.     On May 20, 2008, U.S. Patent No. 7,374,373 (the '373 patent) tilted "Pocket Hole Drilling Machine" was issued by the United States Patent and Trademark Office to Joon Park.

20.     Prior to filing the '373 patent, Kreg Tool manufactured a pocket hole drilling machine known as the DB50 that includes each and every limitation of claim 5 of the '373 patent.

21.     During the pendency of the '373 patent, Park knew of the Kreg Tool's DB50 pocket hole drilling machine but did not disclose it to the Patent Office as is required.

1    22.  On November 3, 2008, Park amended his Complaint by claiming that Kreg Tool's
2 DB55 and DB110 pocket hole drilling machines infringed the '373 patent.

3    23.  Kreg Tool has denied all allegations of infringement and counterclaimed for
4 invalidity, inequitable conduct, and that this is an exceptional case.

5    24.  The Court has determined that Kreg Tool's DB55 and DB110 do not infringe the
6 '373 patent.

## DEFENDANT'S STATEMENT OF THE TEACHING OF CLAIMS

25.  The '988 and '814 patent teach:

> The adjustable pocket drilling fixture 60 of this invention is shown in FIGS. 6 and 7. The fixture 60 has a base 62. Extending from the base are two guide bars 64 and 66. The guide bars are of uniform cross section and are illustrated as being cylindrical. The guide bars are secured in base 62 with their axes parallel.
>
> Clamp body 68 has two holes therethrough which closely fit the guide bars 64 and 66, and the clamp body slides on the guide bars parallel to their axes. The clamp jaw is unitarily formed with the clamp body and extends upward from the guide bars. It has a clamp face 72 which can engage against the workpiece 74. The clamp face 72 is at a right angle with respect to the plane defined by the axes of guide bars 64 and 66. The clamp body 68 also has feet 76 and 78 formed thereon just above the openings for the guide bars. These feet act as stops against which the workpiece 74 engages.
>
> The clamp body 68 is urged toward the base 62 by means of a clamp screw 80, which engages in a threaded nut 82 positioned in the clamp body 68 between the guide holes through the clamp body. The nut 82 and screw 80 preferably lie in the same plane as the guide bars 64 and 66. At the right end, the clamp arm 84 is pivoted on the screw 80 by means of cross pivot pin 86. The cam 88 of the clamp arm 84 has a larger radius toward the base 62 when the clamp arm 84 is in the raised position shown in FIG. 7. Thus, when the clamp arm is raised from the horizontal position to the raised position of FIG. 7, the screw 80 is pulled to the right. This moves clamp body 68 to the right. ['988 Col. 3, lines 34-62.]

26.  The '988 and '814 patents further teach:

> The guide carrier is movable up and down with upright guide bars 94 and 96. It can be secured at any selected position by tightening of the set screw 108 seen in FIG. 7. Height can be established by means of a turret 110 which is rotatably mounted on the base 62 over the clamp screw 80 and just to the right of guide carrier 98. The turret 110 has four different height sections with the first and highest having a top surface 112, a second height section having a height surface 114, a third height having a top surface 116, and the lowest step having

a top surface 118. The turret can be rotated so that any one of these surfaces can engage under the bottom surface 120 of the guide carrier 98.

While the guide carrier can be adjusted to any desired height on its upright guide bars 94 and 96, the turret provides a way to set the height for particular thickness of the workpiece. For example, the lowest step 118 on the turret is suitable for a workpiece which is 1/2 inch thick. This permits the proper positioning of the guide carrier to drill the pocket hole in a position, as described above. The height of surface 116 is suitable for a workpiece which is 3/4 inch thick, and the height of the turret step 114 is suitable for a workpiece which is 11/8 inches thick. Similarly the height of the turret section 112 is suitable for a workpiece which is 11/2 inches thick. This presets the guide carrier height suitably to pocket-drill a workpiece of that thickness and come out at a suitable position at the edge of the workpiece. Thus, accurate setup height is quickly and easily achieved.  ['988, Col. 4, lines 27-54.]

27.     The '988 and '814 patents also teach:

With the clamp arm 84 in the open, horizontal position, the arm is rotated on the axis of screw 80 until the clamp body 68 is almost clamped on the workpiece. Then the clamp arm is raised in the position shown in FIG. 7. This draws the screw 80 to the right by means of the cam action of cam surface 88 to clamp the workpiece 74 in place.  ['988 Col. 5, lines 7-12].

28.     The '988 and '814 patents also teach:

The pocket drilling fixture has a clamp base with a clamp face thereon. Opposing it is a clamp body with an opposing clamp face. Clamp structure, including a clamp arm on the base urges the faces together to clamp over a workpiece therebetween in a clamping direction. A guide carrier is mounted on the base to move in the direction at a right angle to the clamping direction. The base has a turret thereon with stops which can be positioned beneath the guide carrier to set its height above the base so that height can be preselected, depending on the workpiece thickness.  [Abstract.]

29.     U.S. Patent No. 7,373,373 teaches:

A pocket-hole drilling implement 1 (or a body thereof) in a first exemplary embodiment according to the present invention is illustrated in FIGS. 1 through 6. FIGS. 1 and 2B show a body 1, a frame 1A, a drilling module 1B, a guide module 1C, a fence module 1D and a clamping module 1E as a top and a side cross-sectional view, respectively. FIG. 2B shows a step-drill 36 rigidly mounted on an output shaft 37 of the motor 30, and the guide block 40 that has a clearance bore formed therein without a drill guide. FIG. 3 shows a top view of the drilling module 1B, the guide module 1C, and the positional relationships of a bar tie 34 locations "I" and "II". FIG. 4 shows a front view of the clamping module 1E and the fence module 1D. FIG. 5 shows a top view of the positional relationships among a first workpiece 20 with a drilled pocket-hole 21, an

4

actuation plunger 57, an initiation switch 52, a clamp pad 74, and a step-drill 36, a fence module 1D without its cover 51a, and a turret 60. FIG. 6 shows a cross-sectional front view of the guide module 1C.  [Col. 4 lines 40-58].

As shown in FIGS. 1 through 6, the body 1 may include a generally rectangular shaped frame 1A, a removable plate 25, a work surface or a main plate 24, a drilling module 1B, a guide module 1C, a fence module 1D and a clamping module 1E. Two plates 25 and 24 may be fastened onto a flange portion of the frame 1A. The drilling module 1B may include a motor 30, a gear box 31, a motor bracket 32, two guide bars 33, a bar tie 34, a lateral coupling 35 and a step-drill 36. The guide module 1C may include a guide block 40, two guides 40a, a drill guide 42, a linear actuator such as air cylinder 45, a home switch 46, and a chip remover 44, which may be mounted onto the main plate 24 by fasteners 27. The fence module 1D may include a fence 50, an initiation switch 52, a L-bracket 53, two fasteners 54 that hold the fence 50 and the L-bracket 53, and two fasteners 61 that connect fence extensions 55 and turrets 60 onto a reinforcement plate 24a. The clamping module 1E may include a clamp bracket 70, fasteners 71 to mount the clamp bracket 70 onto the main plate 24, a clamping actuator such as air cylinder 72, a pad 74, and a fastener 73 that secure the air cylinder 72 in the clamp bracket 70.  [Col. 4 line 59 – Col. 5 line 12].

As shown in FIGS. 1, 2A, 3, and 6, an electric or air motor 30 may be mounted on the motor bracket 32 and transmits rotational torque to right angle gears in gear box 31, which rotates the step-drill 36. The right angle output shaft from the gear box 31 provides a shorter length of the motor 60 in the Y-direction and the capability to mount the step-drill 36 rigidly thereon. A lateral coupling 35 may be disposed in between the step-drill 36 and the output shaft from gear box 31 to compensate lateral/angular misalignment for the step-drill 36 between the output shaft from the gear box 31 and the drill guide 42 in the drilling module 1C.  [Col. 5 lines 12-23].

Two guide bars 33 may be attached to the motor bracket 32 at one end (-Y) and to the bar tie 34 at the other end (+Y), which may be slidably mounted onto two guides 40a that is disposed in the guide block 40. An initiation switch 52 is disposed inside of the fence 50 so that its urge with a workpiece 20 causes the following sequences: 1) actuation of clamp air cylinder 72 to secure workpiece by the pad 74; 2) turning the motor 30 power "on" at home position "I"; 3) movement (+Y) of the drilling module 1B by the air cylinder 45 toward end position "II" while cutting a pocket-hole 21 in workpiece (home position of bar tie 34 is indicated as "I" shown in full lines and forwarded end position of the bar tie 34' is indicated as "II" shown in dashed lines); 4) reverse movement (-Y) of the module 1B after the bar tie 34 contacts with the reversing switch 47; 5) turning the motor power "off" at position "I" after the bar tie 34 urges with the home switch 46, and 6) releasing the pad 74 from the workpiece and finishing one drilling cycle. The axis (Y) of the drilling module 1B movement and its step-drill intersect the main plate 24 at approximately 15 degrees.  [Col. 5 lines 24-43].

As shown in FIGS. 1, 2A, 3, and 5, two longitudinal through slots 28 may be formed in the main plate 24 to fasten the L-bracket 53 to the fence 50 by two fasteners 54, which enables the fence 50 and L-bracket 53 to move together longitudinally when fasteners 54 are loosened. [Col. 5 lines 52-56].

## DEFENDANT'S STATEMENT OF NON-INFRINGEMENT AND INVALIDITY

30. Kreg Tool's K3 pocket hole jig does not have a gaging structure between said base and said guide carrier as that the guide carrier can be positioned at a predetermined distance from said base.

31. Kreg Tool's K3 pocket hole jig does not have a clamping face on said body facing said clamp face on said base.

32. Kreg Tool's K3 pocket hole jig does not have a measuring structure selectively positionable between said base and said guide carrier so that said guide carrier can be positioned a selected distance above said base so that the position of a pocket hole to be drilled in a workpiece engaged between said clamping faces can be selected.

33. Kreg Tool's K3 pocket hole jig does not have an upright structure disposed on said base to engage said guide carrier so that said guide carrier can be positioned at a predetermined distance from said base.

34. Kreg Tool's K3 pocket hole jig does not have a guide carrier that is slidably mounted on said upright structure in a direction substantially normal to said clamping direction and to said perpendicular direction.

35. Kreg Tool's K3 pocket hole jig does not have a quick engagement used to slidably couple said guide carrier and said upright structure, wherein said quick engagement can be disengaged to slide said guide carrier with respect to said upright structure, and engaged to fix a position of said guide carrier with respect to said upright structure.

36. The Kreg Tool's K2000 pocket hole jig (U.S. Patent No. 6,481,937) and the A2H/A2F adaptor or U.S. Patent No. 4,842,453 to Raines renders claims 1, 12 and 20 of the '988 patent unpatentable under 35 U.S.C. §§ 102 and 103.

37. The Kreg Tool's K2000 pocket hole jig (U.S. Patent No. 6,481,937) and the A2H/A2F adaptor or U.S. Patent No. 4,842,453 to Raines or Kreg Tool's Rocket pocket hole jig (U.S. Patent No. 5,676,500) renders claims 1, 2, 4, 5, 6, 9, 10 and 11 of the '814 patent unpatentable under 35 U.S.C. §§ 102 and 103.

38. The Kreg Tool DB50 anticipates claim 5 of the '373 patent under 35 U.S.C. § 102(a) and (b).

39. The specification of the '988 and '814 patents do not teach a guide carrier being slidably or movably mounted on said base to move in a direction parallel to said plane or to move substantially parallel to said clamping faces or to move in a substantially perpendicular direction with respect to said base face in violation of 35 U.S.C. § 112.

40. The specification of the '814 patent does not teach that a guide carrier is slidably mounted on said upright structure in a direction substantially normal to said clamping direction and to said perpendicular direction in violation of 35 U.S.C. § 112.

41. The '988, '814 and '373 patents are unenforceable pursuant to 37 C.F.R. § 1.56 (Rule 56) base on Park's failure to disclose non-cumulative, material prior art to the Patent Office with deceptive intent.

## CONTENTIONS OF LAW

<u>Patent Infringement</u>.  "Determining whether a claim has been infringed requires a two step analysis. 'First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process.'" *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1361 (Fed. Cir. 2007) (citation omitted). Literal infringement exists only when each and every claim limitation is found in the accused device. *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002); *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 547 (Fed. Cir. 1994). When comparing the accused device to a claim, "[t]he essential inquiry is whether 'the accused product or process contain elements identical or equivalent to each claimed element of the patented invention[.]' ... In other words, the "all elements" rule is applicable to infringement under the doctrine of equivalents just as it is to

7

literal infringement." *Tip Systems, LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1376-7 (Fed. Cir. 2008) (citation omitted). *See also, PSN Illinois, LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1167-8 (Fed. Cir. 2008) ("Additionally, there can also be no infringement under the doctrine of equivalents because such a finding of infringement would read the "ready for mounting" limitation out of the claim). The burden of showing that each limitation of a claim is met by a literal or equivalent element is born by the Plaintiff. *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 954 (Fed. Cir. 1993).

Under the all-elements rule, "an accused product or process is not infringing unless it contains each limitation of the claim, either literally or by an equivalent."; *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety."). The all elements rule provides that the doctrine of equivalents does not apply if applying the doctrine would vitiate a claim limitation. *Seachange Int'l v. C-Cor, Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005).

To infringe under the doctrine of equivalents an accused device must include an equivalent for each literally absent claim limitation. *Toro Co. v. White Consol. Industries, Inc.*, 266 F.3d 1367, 1370 (Fed. Cir. 2001). To be considered an equivalent of a particular claim limitation, the differences between the literal claim language and the element in the accused device must be "insubstantial". *Id*. To be considered an equivalent of a particular claim limitation, the accused device must perform substantially the same function in substantially the same way to obtain substantially the same result. *Business Objects, S.A. v. Microstrategy, Inc.*, 393 F.3d 1366, 1374 (Fed. Cir. 2005). To be an equivalent, the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed. *Perkin-Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1533 (Fed. Cir. 1987).

<u>Willfulness of Patent Infringement</u>.  Before a patentee can claim willful infringement of the patent, a very high burden must be carried as was newly established by the *en banc* Federal Circuit in *In re Seagate Technology, LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (*en banc*): Accordingly, we overrule the standard set out in *Underwater Devices* and hold that proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness. Because we abandon the affirmative duty of due care, we also reemphasize that there is no affirmative obligation to obtain opinion of counsel.  We fully recognize that "the term [reckless] is not self-defining." *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  However, "[t]he civil law generally calls a person reckless who acts . . . in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." Id. (citing Prosser and Keeton *§ 34*, pp. 213-14; *Restatement (Second) of Torts § 500* (1965)).

Accordingly, to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. *See Safeco, 127 S. Ct. at 2215* ("It is [a] high risk of harm, objectively assessed, that is the essence of recklessness at common law."). The state of mind of the accused infringer is not relevant to this objective inquiry. If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer.  *Id.* at 1371.

In determining whether an infringer acted in bad faith the court will consider the totality of the circumstances, including (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed.  *Bott v. Four Star Corp.*, 807 F.2d 1567 (Fed. Cir. 1986) (overruled on other grounds by, *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed. Cir. 1992)).  Copying is not likely to be found where the infringer was unaware of the patentee's work in developing the patented device.  *Aerosol Research Co. v. Scovill Mfg. Co.*, 334 F.2d 751 (7th Cir. 1964).

9

<u>Patent Invalidity for Anticipation</u>.  A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention.  *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  The validity analysis is a two-step procedure: "The first step involves the proper interpretation of the claims. The second step involves determining whether the limitations of the claims as properly interpreted are met by the prior art."  *TI Group Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1139 (Fed. Cir. 2004).

"35 U.S.C. § 102(a) and (b) define prior art as what is known in the literature or deemed to be publicly available through use or sale." *Lamb-Weston, Inc. v. McCain Foods*, 78 F.3d 540, 549 (Fed. Cir. 1996).  According to 35 U.S.C. § 102(a) and (b) a person shall be entitled to a patent unless (a) the invention was known or used by others in this country … before the invention thereof by the Applicant for patent or (b) the invention was patented or described in a printed publication in this country . . . or in public use or one sale in this country, more than one year prior to the date of the application . . .  35 U.S.C. § 102.

"Claimed subject matter is 'anticipated' when it is not new; that is, when it was previously known.  Invalidation on this ground requires that every element and limitation of the claim was previously described in a single prior art reference, either expressly or inherently, so as to place a person of ordinary skill in possession of the invention." *Sanofi-Synthelabo v. Apotex, Inc.*, 2008 U.S. App. LEXIS 24991, *14 (Fed. Cir. 2008). "In other words, if granting patent protection on the disputed claim would allow the patentee to exclude the public from practicing the prior art, then that claim is anticipated, regardless of whether it also covers subject matter not in the prior art." *Atlas Powder Co. v. Hanex Products, Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999).

According to 35 U.S.C. § 102(e)(2), "[a] person shall be entitled to a patent unless . . . the invention was described in . . . a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent".  35 U.S.C. § 102(e)(2).  The effect of 35 U.S.C. § 102(e) is to make a United States patent available as a prior art reference as of the filing date of the patent.  *In re Hilmer*, 53 CCPA 1288, 359 F.2d 859 (CCPA 1966).  If a party does not come forward with evidence of an earlier date of invention, then the invention

10

date is the filing date of a patent.  *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 572, 1577 (Fed. Cir. 1996).

"Patents are presumed to be valid. 35 U.S.C. § 282. A party challenging the validity of a patent bears the burden of proving invalidity by clear and convincing evidence." *Voda v. Cordis Corp.*, 536 F.3d 1311, 1322 (Fed. Cir. 2008). "The presumption is a procedural device, not a substantive rule." *The D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1147 n2 (Fed. Cir. 1983). See also,*Chore-Time Equipment, Inc. v. Cumberland Corp.*, 713 F.2d 774, 780 (Fed. Cir. 1983) ("The presumption is, like all presumptions in law, a starting place and a procedural device assigning the burden of proof. To treat the presumption as irrebuttable would be to oust the courts of their jurisdiction to consider a challenge to the validity of patents before them."); *see also, e.g., Black and Decker Inc. v. Hoover Svc. Center*, 765 F. Supp. 1129, 1135 (D. Conn. 1991), *citing Roper Corp v. Litton Systems, Inc*., 757 F.2d 1266, 1270 (Fed. Cir. 1985).

When the prior art was before the examiner during prosecution of the application part of the burden on the party alleging invalidity is to show that the PTO was wrong in its decision to grant the patent. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1360 (Fed. Cir. 1984).  Still, prior art being submitted to the Patent Office does not, in and of itself, prohibit a finding of invalidity.  *See Tyler Refrigieration v. Kysor Industrial Corp.,* 777 F.2d 687, 690 (Fed. Cir. 1985).

Although the defendant's overall burden of proof remains unaffected, in instances wherein a defendant relies upon newly cited prior art not considered by the Patent Office to invalidate a patent, the defendant does not bear the burden of overcoming the deference due to the PTO.  *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 – 1360 (Fed. Cir. 1984).   When new evidence touching validity of the patent not considered by the PTO is relied on to establish invalidity, the challenger's evidence of invalidity may "carry more weight and go further toward sustaining the attacker's unchanging burden." *Id.* at 1360.  Accordingly, "new prior art not before the PTO may so clearly invalidate a patent that the [challenger's] burden is fully sustained merely by proving its existence and applying the proper law". *Id.*

Patent Invalidity for Obviousness. Under section 103(a), "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." "Obviousness is a question of law based on underlying questions of fact." *Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1379 (Fed. Cir. 2008). The test for obviousness was enunciated in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966): Under *§ 103*, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

The Supreme Court explained in *KSR International Co. v. Teleflex Inc.*, 127 S.Ct. 1727 (2007) why combinations of old elements with no change in their functions are obvious: Neither the enactment of *§ 103* nor the analysis in *Graham* disturbed this Court's earlier instructions concerning the need for caution in granting a patent based on the combination of elements found in the prior art. For over a half century, the Court has held that a 'patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. '*Id.* at 1739 ("This is a principal reason for declining to allow patents for what is obvious. The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.*).

In *KSR*, the Supreme Court held that "[w]hen a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely

bars its patentability." *KSR International Co. v. Teleflex Inc.*, 127 S.Ct. at 1740. "In many fields ... it often may be the case that market demand, rather than scientific literature, will drive design trends. Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility." *Id.* at 1741.

Also, "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* at 1742. "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103." *Id.* at 1742.

<u>Patent Invalidity Lack of Written Description</u>.  Section 112, ¶ 1 of the Patent Act requires that "[t]he specification shall contain a written description of the invention . . ." 35 U.S.C. § 112 ¶ 1.  The written description requirement "serves a teaching function, as a 'quid pro quo' in which the public is given 'meaningful disclosure' in exchange for being excluded from practicing the invention for a limited period of time."  *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 922 (Fed. Cir. 2004).  "Adequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation."  *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991).  Written description issues are a question of fact based solely on the language of the patent specification.  *Univ. of Rochester*, 358 F.3d at 927.  A limitation is sufficiently disclosed only if one skilled in the art, reading the original disclosure, can "immediately discern the limitation at issue."  *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000).

<u>Patent Invalidity Enablement</u>.  35 U.S.C. § 112, P 1 presents the enablement requirement and states:

13

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

*ALZA Corp. v. Andrx Pharms., LLC*, 2010 U.S. App. LEXIS 8553 (Fed. Cir. April 26, 2010). Enablement is determined at the effective filing date of the patent's application. *Id. citing Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1371-72 (Fed. Cir. 1999).. "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997)(*quoting In re Wright*, 999 F.2d 1557, 1561 (Fed. Cir. 1993)).  This determination is a question of law based on underlying factual inquiries. *Enzo Biochem*, 188 F.3d at 1369.  Lack of enablement must be proven by clear and convincing evidence. *ALZA Corp.*, 2010 U.S.App.LEXIS at *13.  Factors for determining undue experimentation include (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims. *Id. citing In re Wands*, 858 F.2d 731, 735 (Fed. Cir. 1988).

<u>Patent Unenforceability</u>.  A patent applicant is under a duty of candor in dealing with the Patent Office, as provided under 37 C.F.R. § 1.56. A patent is unenforceable where the patent applicant engages in fraud on the Patent Office by withholding material information, by making material misstatements to the Patent Office, or by submitting false material information to the Patent Office, and that the applicant has an intent to deceive the Patent Office. *Flex-Rest LLC v. Steelcase, Inc.*, 455 F.3d 1351 (Fed. Cir. 2006); *Board of Education v. American Bioscience, Inc.*, 333 F.3d 1330, 1343 (Fed. Cir. 2003).  Under 37 C.F.R. § 1.56 information is material when not cumulative and by itself or in combination with other information presents a prima facie case of unpatentability of a claim.  37 C.F.R § 1.56.  An intent to deceive the Patent Office may be inferred where the non-cited art was highly material, where the patent applicant knew or should

have known of its materiality, and the patentee has failed to come forth with any credible good faith explanation for its failure to disclose the prior art to the Patent Office. *Praxair Inc. v. ATMI Inc.*, 543 F.3d 1306 (Fed. Cir. 2008).

<u>Patent Damages</u>.  Upon a showing of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868 (Fed. Cir. 2010)(quoting 35 U.S.C. § 284).  "A "reasonable royalty" derives from a hypothetical negotiation between the patentee and the infringer when the infringement began." *Id. citing Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995).  The determination of the royalty stemming from the hypothetical negotiation is often made by assessing factors such as those set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp 1116, 1120 (S.D.N.Y. 1970).  *Minks v. Polaris Indus.*, 546 F.3d 1364, 1372 (Fed. Cir. 2008).  These non-exclusive factors include:

> **1.**  The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.  **2.** The rates paid by the licensee for the use of other patents comparable to the patent in suit.  **3**. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.  **4**. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**5**. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.  **6.** The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.  **7.** The duration of the patent and the term of the license.  **8.** The established profitability of the product made under the patent; its commercial success; and its current popularity.  **9.** The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.  **10.** The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.  **11**. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.  **12.** The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.  **13.** The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.  **14.** The opinion testimony of qualified experts.  **15.** The amount that a licensor (such as the patentee) and a licensee (such as the infringer)

15

would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pacific Corp.*, 318 F. Supp at 1120.

When a patentee seeks damages on unpatented components sold with a patented apparatus, including convoyed sales, courts have applied a formulation known as the "entire market value rule" to determine whether such components should be included in the damage computation, whether for reasonable royalty purposes. *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995). The entire market value rule permits recovery of damages based on the value of a patentee's entire apparatus containing several features when the patent-related feature is the "basis for customer demand." *Id.*

The entire market value rule is applied to include in the compensation base unpatented components of a device when the unpatented and patented components are physically part of the same machine. *Id.* The rule also allows inclusion of physically separate unpatented components normally sold with the patented components. *Id.* However, the unpatented and patented components together are considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit. *Id.*

> A limitation on damages, when recovery is sought on sales of unpatented components sold with patented components, to the effect that the unpatented components must function together with the patented component in some manner so as to produce a desired end product or result. All the components together must be analogous to components of a single assembly or be parts of a complete machine, or they must constitute a functional unit. Our precedent has not extended liability to include items that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage. We are not persuaded that we should extend that liability. Damages on such items would constitute more than what is "adequate to compensate for the infringement."

*Id.*

Laches. To invoke laches, a defendant must prove that the plaintiff delayed filing suit an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have

known of its claim against the defendant and that the delay resulted in material prejudice to the defendant. *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995). Once those factual premises are established, the court weighs the equities to assess whether laches should apply to bar those damages that accrued prior to suit. *State Contr. & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1065 (Fed. Cir. 2003)(*citing Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992)(*en banc*). The material prejudice required to show laches may be either economic or evidentiary. *Aukerman*, 960 F.2d at 1033. Economic prejudice occurs when a defendant suffers the loss of monetary investments or incurs damages that likely would have been prevented by earlier suit. *Id.* A nexus must be shown between the patentee's delay in filing suit and the expenditures and the alleged infringer must change his position "because of and as a result of the delay." *State Contr*, 346 F.3d at 1065 (*quoting Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992)).

## ABANDONED ISSUES

Pursuant to CivLR 16.1(f)(2)(b), Defendant submits that no issues have been abandoned at this time.

## EXHIBITS

Pursuant to CivLR 16.1(f)(2)(c), Defendant's list of exhibits is filed under separate cover.

## WITNESSES

Pursuant to CivLR 16.1(f)(2)(d), Defendant's list of witnesses is filed under separate cover.

Respectfully submitted,

Dated: April 30, 2010

*/s/ John L. Haller*
GORDON & REES LLP
John L. Haller, California Bar No. 61392
101 West Broadway, Suite 1600
San Diego, CA  92101
619-696-6700 / 619-696-7124 FAX
jhaller@gordonrees.com

F.S. FARRELL, LLC
Frank S. Farrell, Minnesota Att. No. 28447
7101 York Avenue South, Suite 153
Edina, MN 55435
952-921-3260
952-216-0106 FAX
frank@fsfarrell.com

ZARLEY LAW FIRM, P.L.C.
Timothy J. Zarley, Iowa Bar No. 15785
Capital Square, Suite 200
400 Locust Street
Des Moines, IA 50309-2350
515-558-0200
515-558-7790 FAX
tzarley@zarleylaw.com

Counsel for Defendant
CAS ENTERPRISES, INC.
D/B/A KREG TOOL COMPANY

**CERTIFICATE OF E-FILE SERVICE**

I hereby certify that on April 30, 2010, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

Paul E. Adams
THE ADAMS LAW FIRM
550 West C Street
Suite 2000
San Diego, CA 92101
e-mail: adamspatentlaw@gmail.com

Ryan B. Kennedy
KENNEDY LTD.
901 Rio Grande Blvd., N.W., Suite H262
Albuquerque, NM 87104
e-mail: kennedyltd@mac.com

There are no other parties/attorneys to be served that are not ECF users.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and executed on April 30, 2010, in the City of San Diego, State of California.

*/s/John L. Haller*
John L. Haller